UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

JOSEPH ROSA,                                    :

                     Plaintiff,           :        **15 CV** _____

                              :        **15 CV 1665**

    -against-                                 :        **VERIFIED COMPLAINT**

                              :        **PLAINTIFF REQUESTS A**

TCC COMMUNICATIONS, INC., TCC WIRELESS,   :        **TRIAL BY JURY**
INC., TCC HOLDCO, INC., SHAHER ISMAIL, AND :
JAVED MALIK,                                    :

                 Defendants.                   :

------------------------------------------------------------- X

JUDGE PAULEY

MAR 06 2015

U.S.D.C. S.D.N.Y.

Plaintiff, Joseph Rosa ("plaintiff" or "Mr. Rosa"), by his attorney, Brendan Chao, for his Complaint against TCC Communications, TCC Wireless, TCC Holdco. Inc. (hereinafter collectively referred to as "TCC"), Shaher Ismail ("defendant Ismail" or "Ismail"), and Javed Malik ("defendant Malik" or "Malik") alleges as follows:

### THE PARTIES

1.      Plaintiff Joseph Rosa was, at all relevant times herein, a New York resident.

2.      Defendant TCC Communications is an Illinois corporation with its principal place of business in Carol Stream, Illinois.

3.      Defendant TCC Wireless is an Illinois corporation with its principal place of business in Carol Stream, Illinois.

4.      Defendant TCC Holdco. Inc. is, upon information and belief, a Delaware corporation with its principal place of business in Carol Stream, Illinois.

5.      Defendant Shaher Ismail is an Illinois resident, and was/is the President of both TCC Communications and TCC Wireless, and is corporate officer of TCC Holdco, Inc.

6.      Defendant Javed Malik is an Illinois resident, and was/is a corporate officer

of TCC Holdco, Inc.

## THE NATURE OF THE ACTION

7.      This is a civil action for damages and remedies brought for, among other things, breach of contract.  Specifically, the parties entered into two separate agreements regarding two distinct wireless service businesses.  One agreement (the "Partnership Agreement") gave plaintiff a 25% interest in the retail store business of defendant TCC, which business sold in January 2015 for approximately $26 million.  The second agreement (the "Subscription Agreement") related to TCC's prepaid T-mobile sim-card business (the "sim-card business").  This Subscription Agreement called for plaintiff to receive a percentage of net monthly profits of the sim-card business, and also gave plaintiff an 11% ownership interest in the sim-card business itself.

8.      Among other things, the Partnership Agreement called for defendants to pay plaintiff 25% of the sale proceeds of the retail store business, which defendants failed to do.  In addition, the Partnership Agreement called for the monthly payment of net profits from the retail store business, which defendants also failed to do.

9.      Defendants partially paid plaintiff his monthly payment as called for in the Subscription Agreement, but Defendants refused to provide plaintiff with the books and records so that a proper accounting of the total amount due could be calculated.  Defendant Ismail authorized the issuance of two credit cards to plaintiff to offset the growing and ongoing financial obligation owed by defendants' sim-card business to plaintiff.

## JURISDICTION AND VENUE

10.      The amount in controversy in this matter exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.  Diversity jurisdiction therefore exists pursuant to 28 U.S.C. § 1332.

11.    A substantial part of the events or omissions giving rise to these claims occurred within New York, and venue is therefore appropriate in this Court pursuant to 28 U.S.C. § 1391(a).

12.    This Court has jurisdiction over this action under 28 U.S.C. § 1332, and principles of supplemental jurisdiction, 28 U.S.C. § 1367.

13.    Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to plaintiff's claims occurred in the Southern District of New York.

## FACTS

14.    Plaintiff began working as a sales representative with defendants in or about 2003.

15.    Plaintiff was in charge of supporting defendants' sales and marketing strategy regarding the sale of long distance calling cards.

16.    Throughout this time period, and up until March 2014, Plaintiff also worked for Union Telecard Alliance ("UTA"), which was a subsidiary of IDT Corporation ("IDT").

17.    UTA provided long-distance calling cards and services, and plaintiff was UTA's Regional Sales Director of the North Central Region.

18.    UTA provided proprietary brands of phone products, and TCC Communications provided wholesale distribution of those products.

19.    In or about the fourth quarter of 2009/first quarter of 2010, defendant Ismail's relationship with UTA and IDT deteriorated, and Ismail approached another provider, T-Mobile, to try and become a master dealer.

20.     A master dealer in the telecommunications industry is an entity that receives an exclusive contract from a service provider, e.g. T-Mobile, and is authorized to sell the service provider's products and services; this was known as the "

21.     T-Mobile initially rejected defendant Ismail's business plan because he was unable to provide specific services; those services were that the master dealer possess significant retail experience in the Latino market.

22.     The program that defendants were attempting to gain access to was the lucrative T-Mobile Preferred Retailer ("TPRI") program.

23.     Plaintiff is Hispanic and speaks Spanish fluently; he has more than fifteen years of cellular, and long distance sales experience working specifically with Latino customers.

24.     Defendants put together a revised business plan, and identified plaintiff as the COO and Executive Manager of TCC Wireless.

25.     Plaintiff Rosa participated in numerous conference calls and face to face meetings with various individuals in T-Mobile's management team during the process to gain access to the TPRI program.

26.     In or about June 2010, T-Mobile's regional vice president, Lee Misar, approved TCC Communications business plan, and made TCC Communications an exclusive TPRI.

27.     After defendants gained access to the TPRI program, defendants decided to expand their operations to the Northeast, and decided that plaintiff, who resided in New York, would be best to oversee those operations.

28.     This decision was made in lieu of a previous plan to relocate plaintiff to

4

Chicago to oversee the retail store business in the Illinois.

29.     Defendant Ismail offered plaintiff a partnership in TCC Wireless's retail store business, and in or about March 30, 2011, plaintiff and defendants Ismail and TCC Communications memorialized their partnership. See Exhibit 1 attached hereto.

30.     Defendant Ismail agreed to share a 25% interest in all the T-Mobile retail stores that came into existence in the Northeast, including, but not limited to, New York. Id.

31.     The Partnership Agreement was drafted by an attorney in New York, and was executed by all parties in New York.

32.     This new business relationship with T-Mobile ultimately increased defendant's gross profit by approximately $30-40 million, and increased the value of defendant TCC Wireless when it was sold by defendants in 2015.

33.     It was agreed between plaintiff and defendant Ismail that another individual, Javed Malik ("Malik"), would be brought in to run the retail stores while plaintiff began negotiating terms to open additional retail stores in the Northeast.

34.     Defendant Ismail asked plaintiff not to discuss the Partnership Agreement with anyone because of "office politics."

35.     Beginning in 2011, plaintiff began scouting locations for new retail business stores in New York on behalf of defendant TCC Wireless.

36.     During the time that plaintiff was securing locations for the retail stores, plaintiff was told by defendant Ismail that because he had a 25% interest in the business he should leave the management of the stores to Malik, and focus on building new business in New York, and the Tristate area.

37.     In March 2011, plaintiff became aware of T-Mobile's interest in expanding the prepaid sim-card market, so he began working on increasing this part of the business.

38.     By September 2013, plaintiff had increased TCC's sim-card business to such an extent that it had become T-Mobile's number one prepaid master dealer with more than 17,000 monthly activations.

39.     Because of plaintiff's contribution to the success of the sim-card business, plaintiff and defendant Ismail entered into another partnership agreement concerning the sim card business (the "Subscription Agreement"). See Exhibit 2 attached hereto.

40.     In or about March 2014, plaintiff resigned from his position with IDT, and devoted his full time to expanding the sim-card business.

41.     Defendant TCC Wireless only decided to open retail stores in New York and the Tristate area because plaintiff resided in New York, and he had committed himself to overseeing the establishment and operation of these retail stores.

42.     Defendants were able to establish and operate the retail stores in the Northeast because of plaintiff's experience and efforts.

43.     At this time, plaintiff began receiving a $10,000 draw against the net profit of TCC'S sim-card business.

44.     In addition, defendant Ismail authorized the issuance of two credit cards for plaintiff's personal and business expenses.

45.     In resigning his position with IDT, plaintiff suffered a significant reduction in pay.

46.     In or about July 2014, plaintiff spoke with defendant Ismail and asked him to

produce the profit and loss statements ("P&L"), as they pertained to the sim-card business, so he could better calculate his earnings according to the Subscription Agreement.

47.     Defendant Ismail ignored plaintiff's emails, text messages, and phone calls regarding the P&L records.

48.     Upon information and belief, before March 2014, defendants failed to pay plaintiff the full amount of the proceeds that were agreed to under the partnership Agreement and Subscription Agreement, including the "spiffs" and "residuals" that were associated with the both businesses, plaintiff estimates that he is owed in excess of $400,000.00 on the spiffs and residuals on the sim-card business alone.

49.     Spiffs are a means for retail stores and a master dealer to generate additional income from T-Mobile.  With respect to spiffs, T-Mobile, on a monthly basis, provides the retail stores and its distributors additional incentives based upon Key Performance Indicators ("KPI"). The spiffs can increase a master dealer's monthly income by as much as $100,000.

50.     Residuals are paid by T-Mobile to master dealers when a customer returns to T-Mobile, and signs up for at least two or more months.  T-Mobile pays 6% residuals to the master dealer, which on average, generate $200,000 per month from the sim-card business.

51.     Plaintiff estimates that the retail stores under the TPRI program are generating, in total, approximately $700,000-$800,000 per month.

52.     Under the Subscription Agreement, Plaintiff stood to earn between $30,000-$40,000 per month, but defendants only paid him a monthly draw of $10,000 that only began in March 2014.

53.     In January 2015, defendant Ismail caused an electronic payment of $217,000

to be made to plaintiff for spiffs and residuals, and net profits.

54.     This payment was made after months of plaintiff trying to get defendant Ismail to address his failure to pay him under the terms of the Subscription Agreement.

55.     Shortly after receiving the $217,000, plaintiff received a 1099 from defendant Ismail for the amount of $259,846.33, despite the fact that the money was received in 2015.

56.     In an effort to appease plaintiff, Defendant Ismail told plaintiff to use the company credit cards for personal expenses, which would be offset against the money he owed to plaintiff.

57.     This sum, however, was significantly less that the approximate $400,000 that plaintiff expected; the actual sum owed is difficult to ascertain because defendants have not given plaintiff access to the books and records, which access is authorized by the Agreement.

58.     Plaintiff called defendant Ismail to discuss the shortfall, but Ismail responded simply that he would receive his money when the retail store business was sold.

59.     Upon information and belief, the retail store business was sold in or about January 2015, for approximately $26 million.

60.     Defendants have failed to pay almost all of their financial obligations under both Agreements.

## FIRST CAUSE OF ACTION
### (Breach of Contract – Partnership Agreement)

61.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 60 as if separately set forth herein.

8

62.     Plaintiff has performed all acts required of him under the Partnership Agreement or has offered to perform all of the obligations required of him under the Agreement, but has been rebuffed by defendants.

63.     By their actions and inactions described herein, defendants breached their contractual obligations under the Agreement.

64.     Each of the breaches by defendants was material.

65.     By its actions and inactions described herein, defendants are in default and they have materially breached their obligations under the Agreement.

66.     As a result of these material breaches, plaintiff has been irreparably harmed by this breach of contract.

67.     Plaintiff has no adequate remedy at law, and can only be made whole if defendants are required to specifically perform the terms of the Agreement.

68.     In the alternative, plaintiff has been damaged in an amount to be proven at trial, but believed to exceed the amount of $9,000,000.00.

## SECOND CAUSE OF ACTION
### (Breach of Contract – Subscription Agreement)

69.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 68 as if separately set forth herein.

70.     Plaintiff has performed all acts required of him under the Subscription Agreement, or has offered to perform all of the obligations required of him under the Subscription Agreement, but has been rebuffed by defendants.

71.     Plaintiff has performed all acts required of him under the Subscription Agreement or has offered to perform all of the obligations required of him under the Subscription Agreement, but has been rebuffed by defendants.

72.     Each of the breaches by defendants was material.

73.     By its actions and inactions described herein, defendants are in default and they have materially breached their obligations under the Subscription Agreement.

74.     As a result of these material breaches, plaintiff has been irreparably harmed by this breach of contract.

75.     Plaintiff has no adequate remedy at law, and can only be made whole if defendants are required to specifically perform the terms of the Subscription Agreement.

76.     In the alternative, plaintiff has been damaged in an amount to be proven at trial, but believed to exceed the amount of $1 million.

## THIRD CAUSE OF ACTION
### (Breach of Covenant of Good Faith and Fair Dealing)

77.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 76 as if separately set forth herein.

78.     Implied in every contract is a covenant of good faith and fair dealing.  This covenant prohibits either party from engaging in any act that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

79.     The parties' purpose in having these Agreements was so that plaintiff could share in the profits of the business while providing the necessary expertise to aid in the establishment and subsequent expansion of the business.

80.     Defendants acknowledged their obligations under the Agreements, but have deliberately refused to perform according to the terms of the Agreements.

81.     Due to deliberate refusal to adhere to the terms of the Agreements it has prevented plaintiff from receiving the benefits of the Agreements.  Defendants' conduct is a breach of the duty of good faith and fair dealing implied in the Agreements.

82.     Plaintiff has no adequate remedy at law.  Plaintiff can only be made whole if defendants are required to specifically perform the terms of the Agreements.

83.     In the alternative, plaintiff has been damaged as set forth in the preceding paragraphs.

## FOURTH CAUSE OF ACTION
### (Declaratory Judgment)

84.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 83 as if separately set forth herein.

85.     A real controversy exists between plaintiff and defendants regarding their respective rights and obligations under the Agreements.

86.     Plaintiff requests this Court's declaration that: (a) the Agreements are both valid and binding contracts, and (b) defendants are obligated to effectuate the terms of the Agreements.

87.     Plaintiff has no adequate remedy at law.  Plaintiff can only be made whole if this Court declares that defendants are required to specifically perform the terms of the Agreements.

## FIFTH CAUSE OF ACTION
### (Tortious Interference With Business Relations)

88.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 87 as if separately set forth herein.

89.     Defendants were aware of plaintiff's efforts to enforce the Agreements.

90.     Defendants intentionally interfered with plaintiff's relationships, negotiations and agreements with T-Mobile through the conduct described above.  The interference with plaintiff's business relationships was accomplished for an improper purpose and by improper means because it was based on defendants' own self-interest, prior misrepresentations, and economic coercion.  Defendants engaged in such malicious conduct with the intent to improperly benefit themselves at the expense of plaintiff, and did so knowing that its actions would cast aspersions upon plaintiff's reputation in the cellular service industry.

11

91.     Defendants' tortious interference has caused and continues to cause plaintiff to sustain damages as set forth in the preceding paragraphs.

92.     Defendants acted intentionally and in callous disregard of the rights of plaintiff, and plaintiff is entitled to punitive damages in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
**(Violation of New York Labor Law)**

93.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 to 92 above.

94.     Defendants willfully violated the New York Labor Law, §§ 190 et seq., by failing to pay plaintiff wages for the services he rendered, as described above.

95.     Plaintiff suffered damages caused by defendants' willful violation of New York Labor Law, including liquidated damages, as provided for in New York Labor Law § 198.

96.     Defendants' willful violation also entitles plaintiff to recovery of reasonable attorney's fees.

### SEVENTH CAUSE OF ACTION
**(Accounting)**

97.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 to 96 above.

98.     Plaintiff has sought an accounting and access to defendants' books and records concerning the business underlying both the Partnership Agreement and the Subscription Agreement, but the defendants have not provided plaintiff the requested access.

99.     By virtue of the acts complained of, and the fiduciary obligations owed by defendants to plaintiff, defendants must account for their conduct so that the damages the plaintiff has sustained by reason of the facts alleged may be ascertained and paid to plaintiff by defendants.

12

WHEREFORE, while reserving the right to seek additional damages as available, plaintiffs demand judgment against defendant as follows:

A.      On the First Cause of Action, for specific performance of the Agreement or, alternatively, for damages exceeding the sum of $9 million, and additional damages plaintiff will suffer if it is forced to go out of business;

B.      On the Second Cause of Action, for specific performance of the Agreement or, alternatively, for damages exceeding the sum of $1 million, and additional damages plaintiff will suffer if it is forced to go out of business;

C.      On the Third Cause of Action, for specific performance of the Agreements; and for the declarations described in paragraph 40;

D.      On the Fourth Cause of Action, declaratory judgment in favor of enforcing the Agreements in plaintiff's favor;

E.      On the Fifth Cause of Action, damages including punitive, compensatory, attorney's fees, interest and costs.

F.      On the Sixth Cause of Action, damages including back wages, punitive damages, attorney's fees, interest and costs;

G.      On the Seventh Cause of Action, an accounting of defendants'' financial records.

H.      Such other and further relief as this Court deems just and proper.

## REQUEST FOR EXPEDITED DETERMINATION

Pursuant to Federal Rule of Civil Procedure 57, Plaintiff respectfully requests a speedy hearing of its declaratory judgment claim.

Dated: March 6, 2015
       Rockville Centre, N.Y.


                                        BRENDAN CHAO
                                        Attorney & Counsellor at Law

                                By:     _____
                                        Brendan Chao (BC8811)

                                        Attorney for Plaintiff
                                        50 Merrick Road
                                        Rockville Centre, N.Y. 11570
                                        (516) 466-2033

14

# DECLARATION

I, JOSEPH ROSA, pursuant to 28 U.S.C. § 1746, do hereby declare under penalty of perjury that the allegations made in the foregoing Complaint are true and correct to the best of my knowledge.

JOSEPH ROSA

# EXHIBIT 1

March 30, 2011

Shaher Ismail
TCC Communications Inc.
200 North York Road
Elmhurst, Illinois 60126

Dear Shaher,

This letter follows our discussions regarding a possible partnership between you, TCC Communications Inc and myself and is intended to memorialize our agreement regarding the partnership.

1. I agree to work for TCC Communication Inc. as a Chief Operating Officer of TCC's T-Mobile retail locations in NY, NJ, CT, PA, DE and FI. I understand that I will be required to do one or all of the following:
   a. Work in the General Operations of TCC's T-mobile operations
   b. Engage in Business Development for T-Mobile-related business
   c. Engage in Expansion into both Latino and Non-Latino neighborhoods of T-mobile retail stores.
   d. Real estate procurement within the NY, NJ, CT tri-state area.
   e. Engage in other activities designed to expand TCC's business relative to the T-Mobile retail locations and accounts.

Initially, I will be working ~~25~~ *wherever* hours per week with intention to dedicate myself to TCC's T-Mobile venture on a full-time basis. *as Bussin needed*.

2. You and TCC Communications Inc. (or its successors[1]) will pay and provide me with the following:
   a. A 25% ownership interest in the business of TCC Communications which is related to all T-Mobile stores in the

---

[1] We understand that TCC has the option of expanding, splitting, merging, or creating a different entity or series of entities. Thus, the 25% interest applies to any T-Mobile related business, whether conducted by TCC, its successors, assigns, or any new or merged entity. Until TCC changes corporate structure or its business and assets are assigned to a new corporation, of which I will be a 25% owner, my ownership interest in TCC and the resulting corporations will be guaranteed by a 10% ownership interest in the stock of TCC Communications.

states mentioned herein.  This includes all existing and future T-Mobile USA retail store locations in NY, NJ, CT, PA, DE and .  If TCC changes form of ownership or corporate structure, I will receive a 25% interest in the resulting businesses or corporations of TCC relative to the T-Mobile Stores.

  i. As a result of the 25% ownership interest, You and TCC Communications (or the resulting business or corporations) will pay me 25% of the net profits of the business.  Also, as a result of my ownership of the 25% interest, I will be responsible for 25% of the cost of building out a new T-Mobile retail store.

b. A payment of $7,000 per month, on the first of each month, as a draw against my 25% share of the net profits.  In calculating the amount to be paid each month, TCC will multiply the net profits by 25%.  TCC then will subtract 70% of the product and apply that 70% towards any amounts that I may owe as my share of the build out costs.  The remaining 30% will be paid to me as follows.  However, in the event that the 30% equals to less than $7,000, then I shall only be entitled to receive a payment of $7,000.  And if the 30% is greater than $7,000, then I will receive the difference above the $7,000.  Notwithstanding, I will be entitled to 2% of the net profits for the stores located in NY, NJ, CT, PA, DE and FL.  The net profits will exclude any residuals that are paid to TCC Communications or successor unless agreed by Mr. Ismail or majority stock holder and will be done through an addendum to this agreement.  In the event that, after the 1st anniversary of signing this agreement, the projections regarding the expansion of the business of TCC relative to the T-Mobile stores and accounts turn out to be less than projected, ~~you and TCC agree that I will be paid no less than $7,000 per month for a period of no less than 24 months and such payments will be guaranteed by a 10% interest in the stock of TCC.~~ (30) thirty days notés only ...

c. Advanced payment and reimbursement for the following expenses for:

  i. Business travel expenses
  ii. Car expenses (maintenance, insurance, gas)
  iii. Further business education and certifications

d. Complete access to all company information, including financial and non-financial information.

3. I will not sell my share for at least 24 months from the signing of this agreement, unless you or TCC agree.  In the event that I decide to sell

my interest, I agree not to sell it to anyone unless I first offer it to You, TCC or its successors and my offer is rejected.  The value of my interest will be calculated as follows: 12 months worth of net profits of TCC or its successors, which ever applies, times the number of all the stores, times 25% plus inventory, plus build out cost.

4. In the event that I sell my interest to you or TCC or its successors, you and TCC will pay the value of my interest as follows: 33% upfront, 33% within the first year; and the last 33% within the second year.

5. We agree that the terms of this agreement between you, TCC Communications and me will remain confidential and that we will not disclose this agreement to any individual or company.

6. In the event of the death of one of us, then the shareholders that survive will have the right to buy out the shares of the shareholders that passed away based on the percentage of shares owned by the surviving shareholder who wants to buy shares.  For example, if I own 25%, then I can buy as much as 25% of the shares of the shareholder who passes away.  The payment for the shares will be made as follows: 33% upfront, 33% within the first year, and 33% within the second year.

7. We promise that we can enter into this agreement and that there are not legal restrictions preventing us from carrying out the above.

8. In the event of a dispute between the parties, we agree to take advantage of the services of a neutral mediator.  In the event that we do not agree on a neutral mediator, we will select a mediator of our own who shall then select a neutral mediator.

_____
Joseph Rosa

_____
Shaher Ismail

TCC Communications, Inc

_____
Shaher Ismail

# EXHIBIT 2

## PRE-FORMATION AND SUBSCRIPTION AGREEMENT

This is an Agreement between TCC Communicatons, Inc. ("TCC"), an Illinois corporation, Global Wireless, Inc. ("GW"), a _____ N Y _____ corporation and Joseph Rosa ("Joseph Rosa and GW are, collectively, "JR"), Shaher Ismail ("SI") and Javed Malik ("JM")  to form a legal entity  pursuant to the terms of this Agreement and as otherwise mutually agreed to by the parties. This Agreement is dated this 27 day of January, 2014.

### RECITALS

A. SI and JM are shareholders in TCC and TCC is engaged in a number of businesses including the sale and distribution of prepaid T-Mobile SIM cards (the "Business") and has developed this Business over the course of several years and has developed in connection thereto certain Intellectual Property including software and other intellectual property and trade secrets related to the Business. TCC sells T-Mobile SIM cards pursuant to a contract with T-Mobile (the "T-Mobile Contract").

B. GW and JR have experience in the sale and distribution of pre-paid SIM cards and all of the parties are desirous of: 1) forming a corporation, Limited Liability Company, or such other legal entity that the parties may select to perform the Business ("Legal Entity"): and 2) having JR manage the Business and JR is desirous of assuming such management duties, all pursuant to the terms of this Agreement..

**NOW, THEREFORE,** in consideration of the mutual promises made herein and for other good and valuable consideration in hand paid, the parties agree to the following:

**1. OWNERSHIP; FORMATION OF LEGAL ENTITY; AND TCC PAYMENT OF RESIDUALS TO THE LEGAL ENTITY.**  The parties agree to proceed to form the Legal Entity structured in accordance with the mutual agreement of the parties and pursuant to the terms of this Agreement. Ownership in the Legal Entity shall be as follows:

|     |      |       |
| --- | ---- | ----- |
| SI  | ---- | 44.5% |
| JM  | ---- | 44.5% |
| JR  | ---- | 11%   |

Each month, TCC shall pay to the Legal Entity the residual related to the sale of T-Mobile SIM cards and paid to TCC by T-Mobile under the T-Mobile Contract. In the event T-Mobile terminates the T-Mobile Contract, this Agreement shall terminate.

As part of the formation of the Legal Entity the parties agree to negotiate in good faith the terms of an Owners' Buy/Sell Agreement providing that in the event of death, divorce, bankruptcy, or other relevant circumstance that the ownership interest of the affected owner  be subject to purchase by the legal entity and other owners at a set price.

The parties, as part of the process in deciding on the Legal entity to be formed and other related



structuring issues, agree to consult with tax professionals so as to maximize the tax advantages for all parties..

2. **EMPLOYEES.** JR shall assume the management of the Business. In managing the Business, JR shall devote six (6) full-time employees to the Business – one (1) employee for each of the states of Indiana, Illinois Minnesota and Michigan and two (2) employees for the state of New York. TCC shall assign five (5) employees to the Business – two (2) in the Chicagoland area and three (3) in the country of India.

3. **EXPENSES.** The expenses of managing the Business shall be paid from the revenue of the Business and TCC shall receive five thousand dollars ($5,000.00) each month to pay the expenses of the five (5) TCC employees involved in the Business.

4. **GOALS AND DISTRIBUTION OF NET PROFITS; JR SALARY.** In managing the Business, the goal of JR shall be to maintain the existing residuals of TCC related to the Business and to increase the sales of prepaid T-Mobile SIM Cards.

After payment of all expenses related to the Business, JR shall receive the following distribution of monthly net profits:

a) 10% of any amount up to $199,999;
b) 13% of any amount between $ 200,000 and $274,999;
c) 16% of any amount between $ 275,000 and $349,999;
d) 19% of any amount between $350,000 and $424,999;
e) 25% of any amount between $425,000 and $499,999; 
f) ~~30% of any amount $500,00 and over~~

The balance of any net profits shall be shared equally by SI and JM.

JR shall be paid in advance at the beginning of each month a draw of $10,000 as part of his share of the net profits. Net profits shall be distributed quarterly and thirty days after the end of the quarter and after preparation of the quarterly report.

5. **DISTRIBUTION UPON SALE OF BUSINESS.** If the Business is sold, JR shall receive from the sale the following portion of the sales price after payment of all expenses ("Net Sales Price"), based upon the average monthly net profits for the twelve months preceding the closing on the sale ("12-Month Average Profit"):

a) if the 12-Month Average Profit is less that $200,000, 10% of the Net Sales Price;
b) if the 12-Month Average Profit is between $201,000 and $275,000, 13% of the Net Sales Price;
c) if the 12-Month Average Profit is between $275,001 and $350,000, 16% of the Net Sales Price;
d) if the 12-Month Average Profit is between $350,001 and $425,000, 19% of the Net Sales Price;

e) if the 12-Month Average Profit is over $425,000,  25% of the Net Sales Price.

6. **PROTECTION OF TCC PROPRIETARY RIGHTS**.   GW and JR shall not disclose to any person or use in any way, except insofar as is necessary to perform this Agreement, any Intellectual Property Rights, Trade Secrets, or Confidential Information of TCC including trademarks, trade names, domain names, rights in set-up and goodwill, rights in designs and in computer software, database rights, topography rights, moral rights, and any and all other rights to Confidential Information of TCC.

7. **COVENANT NOT TO COMPETE. GW** and JR shall each execute the Covenant Not to Compete ("Covenant") attached as Exhibit I.  JR is currently selling SIM Cards through Cellucom Inc. and these sales through Cellucom,. Inc. shall not be in violation of the Covenant.

Also, SI, JM and TCC agree that if they decide to sell SIM cards other than T-Mobile SIM Cards,  they will offer JR the opportunity to be a part of such endeavor upon terms and conditions which are materially as favorable as the terms and conditions of this Agreement.

8. **MISCELLANEOUS**.

a) At all times TCC, SI and JM  shall have access to all books and records related to the Business. JR shall have access to those books and records necessary to verify T-Mobile payment of the residual under the Contract.

b) JR  shall devote his full time efforts to the Business.

c) In performing this Agreement, all business shall be conducted under the name of T-Mobile and TCC and only the brands of T-Mobile and TCC shall be promoted..

d) If this Agreement terminates for any reason, GW and JR shall continue to receive the  two and one-half percent (2.5%) commission related to the existing residuals that GW and JR have already generated.

This Agreement is entered into this _27_ day of _January_ 2014 in _Carol Stream_ , Illinois

_____
Joseph Rosa, Individually, and as
President of Global Wireless, Inc.

_____
Shaher Ismail, Individually and as
TCC Communications, Inc.

_____
Javed Malik