UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------

JOSEPH ROSA,

        Plaintiff,

-against-

TCC COMMUNICATIONS, INC., *et al.,*

        Defendants.

----------------------------------------------

15cv1665

OPINION AND ORDER

WILLIAM H. PAULEY III, District Judge:

        Defendants TCC Wireless, LLC ("TCC Wireless"), TCC Holdco, Inc. ("Holdco"), and Javed Malik move to dismiss certain counts of the Third Amended Complaint. For the reasons that follow, their motions are denied in part and granted in part.

## BACKGROUND

### I. Procedural History

        The Third Amended Complaint in this action is the fourth iteration of a complaint seeking damages arising principally from Defendants' alleged breach of two agreements and the fraudulent conveyance of assets from which Plaintiff Joseph Rosa claims he should have been paid.

        On January 5, 2016, this Court granted in part and denied in part Defendants' motion to dismiss the Second Amended Complaint. See Rosa v. TCC Communications, Inc., 2016 WL 67729 (S.D.N.Y. Jan. 5, 2016). In that Order, this Court, among other things, granted Rosa leave to re-plead his fraud claims as fraudulent conveyance claims, and to re-assert allegations supporting successor liability against TCC Wireless and Holdco under the breach of contract claims. Separate from these motions to dismiss, Defendants TCCC, Shaher Ismail, and

Malik filed answers responding to certain claims upon which their previous motions to dismiss were denied. (ECF Nos. 65 and 70.)

Defendants TCC Wireless, Holdco, and Malik now move to dismiss the First, Fourth, and Sixth causes of action of the Third Amended Complaint—breach of contract, fraudulent conveyance, and New York Labor Law, respectively—on grounds that they fail to state a claim for relief. Holdco also seeks dismissal for lack of personal jurisdiction.

II. Operative Facts

The following facts are taken from the Third Amended Complaint and presumed to be true for purposes of resolving these motions. In 2003, Rosa began working with Ismail as a sales representative in charge of supporting Defendants' sales and marketing strategy in the long distance calling cards business. (TAC ¶¶ 21–22.) Beginning in 2009 and 2010, Rosa helped Ismail develop and implement a business plan to become a T-Mobile master dealer, a position that would provide them with exclusive access to T-Mobile's lucrative Preferred Retailer program. (TAC ¶¶ 26–28, 31–32.) Their efforts paid off. TCCC's operations as an exclusive T-Mobile Preferred Retailer increased its profits by approximately $30–40 million. (TAC ¶¶ 33, 35.)

Ismail set his ambitions on expanding TCCC's operations, and tasked Rosa with overseeing the opening of new retail store locations in the Northeast United States. (TAC ¶ 36.) In March 2011, Ismail and Rosa entered into a partnership agreement regarding the expansion of the retail store business, providing Rosa a 25% interest in all new Northeast region T-Mobile retail stores, including New York (the "Partnership Agreement"). (TAC ¶¶ 37–38, Ex. 1.) Thereafter, Malik was brought in to oversee day-to-day operations of the retail stores so that Rosa could focus on opening additional stores in the Northeast. (TAC ¶ 43.) Around the end of

2

2012 and beginning of 2013, Ismail gave Malik an ownership interest in TCCC for his work in running the daily operations of the retail stores.  (TAC ¶ 46.)

Around 2013, Ismail began divesting TCCC of its corporate assets and transferred them to a new entity, TCC Wireless.  (TAC ¶ 47.)  The primary assets transferred to TCC Wireless were the T-Mobile retail stores in which Rosa maintained a 25% equity interest.  (TAC ¶ 53.)  TCC Wireless and TCCC used the same office as their principal place of business, employed the same employees, and utilized the same email addresses.  (TAC ¶ 49.)  They continued using TCCC's financial records to secure leases for T-Mobile retail stores, but amended the leases to reflect TCC Wireless as lessee.  (TAC ¶¶ 49, 51.)  Further, TCCC and TCC Wireless banking funds were commingled, but Ismail also diverted TCCC's income from T-Mobile into a separate account for TCC Wireless.  (TAC ¶¶ 49–50.)

In December 2014, TCC Wireless merged with a newly created entity, Holdco, and transferred its primary assets—including the Northeast region T-Mobile stores—to that entity.  (TAC ¶¶ 52–53.)  In January 2015, Holdco was sold to a third party for approximately $26 million.  (TAC ¶¶ 52, 86.)  Rosa alleges that the successive transfer of assets to TCC Wireless and Holdco—both of which operated as the "same continuing enterprise" as TCCC (TAC ¶ 55)—was done without his knowledge or consent (TAC ¶¶ 15–16) and designed to "circumvent defendants' financial obligations to" him.  (TAC ¶ 54.)

Rosa claims that he was never fully paid under the Partnership Agreement despite multiple requests for payment.  (TAC ¶ 56.)  He also claims that he was never fully paid under the Subscription Agreement dated September 2013, which was consummated to compensate him for his work in the sim-card business.  (TAC ¶ 63.)  Despite a payment of approximately $260,000 in January 2015 and $55,000 in 2014, Rosa alleges that he is still owed in excess of

3

$400,000 under the Subscription Agreement and his pro rata share of the monthly profits generated by the T-Mobile preferred retailer stores, which he estimates to be $700,000–800,000 per month.  (TAC ¶¶ 79–85.)

## DISCUSSION

I.   Standard

All factual allegations in the Third Amended Complaint are accepted as true, and all reasonable inferences are drawn in the Rosa's favor.  Rescuecom Corp. v. Google Inc., 562 F.3d 123, 127 (2d Cir. 2009).  The complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 663, 678 (2009) (citation omitted).  However, the claim must rest on "factual allegations sufficient to raise a right to relief above the speculative level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  It must avoid "labels and conclusions" or a "formulaic recitation of the elements of a cause of action."  Iqbal, 556 U.S. at 678.

Further, any allegations sounding in fraud—like those in support of Rosa's fraudulent conveyance claim—must comport with the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which provides that "[i]n all averments of fraud . . . the circumstances constituting the fraud . . . shall be stated with particularity."  Thus, in general "allegations of fraud based on information and belief do not satisfy the requirements of Rule 9(b)," with the exception that "matters peculiarly within the knowledge of the opposing party" may be "made on information and belief" and a statement of facts on which such belief is founded.  Cargo Partner AG v. Albatrans Inc., 207 F. Supp. 2d 86, 116 (S.D.N.Y. 2002).  While a "plaintiff need not demonstrate in his complaint that what he believes to be true is in fact true,

he must present facts that show that his belief is not without foundation, that it is belief rather than irresponsible speculation." Cargo Partner, 207 F. Supp. at 116.

## II.  DCL § 276

This Court previously observed that the core of Rosa's fraud allegations in the Second Amended Complaint implicated a claim for fraudulent conveyance and granted him leave to re-plead.  Rosa, 2016 WL 67729, at *3.  Under New York Debtor and Creditor Law § 276, "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."  The DCL broadly defines a creditor as "a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent."  N.Y. Debt. and Cred. Law § 270.  Creditor status arises "as soon as the cause of action accrued."  Bulkmatic Transport Co., Inc. v. Pappas, 2001 WL 882039, *11 (S.D.N.Y. May 11, 2001).  Therefore, Rosa attained creditor status when Defendants breached the Partnership Agreement and/or Subscription Agreement, or when Defendants began divesting TCCC of its assets under fraudulent pretenses.

DCL §276 requires the following elements: (1) that the thing transferred has value out of which Rosa could have realized a portion of its claim; (2) that this thing was transferred or disposed of by Defendants; and (3) that the transfer was done with actual intent to hinder, delay, or defraud.  See Fly Shoes s.r.l. v. Bettye Muller Designs Inc., 2015 WL 4092392, at *4 (S.D.N.Y. July 6, 2015).  The first element is satisfied in view of the allegation that TCCC's primary assets—the T-Mobile retail stores from which Rosa would earn his 25% partnership interest—were divested and transferred to parties with whom Rosa lacked a contractual relationship.  (See TAC 53.)

5

A. Participation in the Transfers

Defendants claim that the fraudulent conveyance claim fails because the next two elements are insufficiently pled.  First, Defendants argue that the Third Amended Complaint lacks any allegations that each defendant participated in the fraudulent transfers.  Second, Defendants claim that the allegations insufficiently plead actual intent.  (TCC Wireless Memorandum of Law ("TCC Wireless Mot.") at 6–7 (ECF No. 79).)  More specifically, TCC Wireless contends that while the Third Amended Complaint repeatedly ascribes the actions taken in connection with the alleged fraudulent transfers to all Defendants, those "attempts are unavailing in the face of [Rosa's] specific allegations against Ismail."  (TCC Wireless Mot. at 7.)

But Defendants' argument fail in view of the fact that Ismail "was/is the President of both TCC Communications and TCC Wireless, and is a corporate officer of TCC Holdco, Inc." and that Malik "was/is a corporate officer of defendants TCC Communications, TCC Wireless, and TCC Holdco, Inc."  (TAC ¶¶ 5–6.)  Ismail transferred "assets from TCCC to Wireless and then to Holdco" and with Malik " 'created' Holdco, which took over ownership, control, and operations of the T-Mobile retail stores from Wireless, and [] Ismail sold Wireless, Holdco, or both, to a third party."  (TAC ¶¶ 9, 58.)  In essence, Ismail and Malik in their capacities as corporate officers are alleged to have controlled the entities on both sides of the transaction so that each entity—from TCCC to TCC Wireless, and TCC Wireless to Holdco—could participate in the transfer of assets.  Assessing TCC Wireless and Holdco's intent and participation necessarily requires this Court to account for the intent and actions of the individuals who controlled those entities.  Pennsylvania Pub. School Empl. Ret. Sys. v. Bank of Am. Corp., 874 F. Supp. 2d 341, 363 (S.D.N.Y. 2012) ("Courts routinely impute to the corporation the intent of officers and directors acting within the scope of their authority.").

Therefore, Rosa has sufficiently alleged that both TCC Wireless and Holdco "participate[d] in the fraudulent transfer and are either transferees of the assets, or beneficiaries of the conveyance." 265 West 34th Street, LLC v. Chung, 2015 WL 2190737, at *12 (N.Y. Sup. Ct. May 8, 2015).

The Third Amended Complaint, however, fails to sufficiently plead Malik's individual participation in the transfers. Malik's role as a corporate officer of TCC Wireless and Holdco, without more, is insufficient to establish his own participation in the conveyances. "[A] corporation officer who participates in the commission of a tort may be held individually liable, . . . regardless of whether the corporate veil is pierced," Fletcher v. Dakota, Inc., 99 A.D.3d 43, 49 (App. Div. 1st Dep't 2012), but Malik, "who [was] not [a] transferee of either conveyance[,] cannot be held liable without piercing the corporate veil unless [he] benefited from the conveyances." D'Mel & Assocs. v. Athco, Inc., 105 A.D.3d 451, 452 (App. Div. 1st Dep't 2013). The Third Amended Complaint's allegations regarding Malik's personal participation and, any benefit he may have personally received, in the fraudulent conveyance scheme are scant. Accordingly, the fraudulent conveyance claim against Malik is dismissed with prejudice.

B. Actual Intent—Badges of Fraud

The third element under DCL § 276 requires proof of actual intent. Defendants argue that Rosa fails to plead "actual intent to defraud," (TCC Wireless Mot. at 12) but "[i]t is well accepted that intent to <u>hinder or delay</u> creditors is sufficient, and intent to defraud need not be proven." In re Jacobs, 394 B.R. 646, 658 (Bankr. E.D.N.Y. 2008) (emphasis added). Moreover, the transferor's intent—not the transferee's—is critical to the analysis. See In re Sharp Intern. Corp., 403 F.3d 43, 56 (2d Cir. 2005) (internal quotation marks and citations

omitted); Jacobs, 394 B.R. at 658 ("it is the intent of the transferor and not that of the transferee that is dispositive.") (internal quotations and citations omitted).

While Rule 9(b)'s pleading standards apply generally, "[w]ith respect to allegations of fraudulent intent, the Second Circuit has held that scienter need not be alleged with great specificity, and that conclusory allegations of scienter are sufficient if supported by facts giving rise to a strong inference of fraudulent intent." Cargo Partner, 207 F. Supp. 2d at 116. The scienter here—actual intent—may be established through "badges of fraud," or "circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." Sharp, 403 F.3d at 56 (citing Wall St. Assocs. v. Brodsky, 684 N.Y.S. 2d 244, 247 (1st Dep't 1999)).

The badges of fraud consist of the following: (1) a close relationship between the parties to the alleged fraudulent transaction; (2) the inadequacy of consideration; (3) the transferor's knowledge of the creditor's claims and the transferor's inability to pay them; (4) the retention of control of the property by the transferor after the conveyance; (5) the fact that the transferred property was the only asset sufficient to pay the transferor's obligations; (6) the fact that the same attorney represented the transferee and transferor; and (7) a pattern or course of conduct by the transferor after it incurred its obligation to the creditor. A&M Global Mgmt. Corp. v. Northtown Urology Assocs., P.C., 115 A.D. 3d 1283, 1288 (App. Div. 4th Dep't 2014). Additionally, actual intent may be evidenced by "the secrecy, haste, or unusualness of the transaction." HBE Leasing Corp. v. Frank, 48 F.3d 623, 639 (2d Cir. 1995).

When read in the light most favorable to Rosa, the Third Amended Complaint sets forth several badges of fraud that give rise to an inference of intent. First, there is a close relationship between the parties involved in each transaction. The Third Amended Complaint

8

alleges that around the end of 2012 or beginning of 2013, Ismail "began to divest TCC Communications of its corporate assets and transferred them to TCC Wireless." (TAC ¶ 47.) Further, "[i]n or about December 2014, TCC Wireless merged with a newly-created company, TCC Holdco, which was then sold to a third party in January 2015." (TAC ¶ 52.) For each of the entities involved, two individuals—Ismail and Malik—served as corporate officers. (TAC ¶¶ 5–6.) They are alleged to have created the entities that participated in the alleged fraudulent transfers. (TAC ¶¶ 9, 47, 57, 58, 59, 89.) And while Ismail is alleged to have orchestrated each of those transfers, Ismail and Malik worked for the entities on both sides of the transaction and were required to assent to every action taken.

The close relationship between Ismail, TCC Wireless, and Holdco is further amplified by allegations demonstrating that they all shared the same resources in operating the "continuing enterprise" that originated from TCCC. (TAC ¶ 55.) The Third Amended Complaint alleges that TCC Wireless and TCCC used the same office, employed the same workers, and utilized the same email addresses. (TAC ¶ 48.) TCCC used its financial records to secure leases for the T-Mobile Stores (TAC ¶ 48) that had been transferred to TCC Wireless and later to Holdco. And those leases were amended to reflect TCC Wireless as the leaseholder even though TCCC's financial records were used to secure them. (TAC ¶ 51.) Further, the complaint alleges that TCCC and TCC Wireless commingled their banking funds. (TAC ¶ 49.) That Ismail diverted TCCC's income received from T-Mobile into a different bank account set up for TCC Wireless does not undermine the commingling allegation—in fact, it only underscores the fact that funds properly designated for TCCC were actually placed under the control of TCC Wireless. (TAC ¶ 50.)

Second, the transferors had knowledge of Rosa's claims, and although the Third Amended Complaint does not allege that they were unable to pay it, they certainly evaded payment. Ismail and TCCC knew at the inception of the Partnership Agreement that Rosa had a claim to be paid 25% of his interest in newly created T-Mobile retail stores in the Northeast. Ismail and Malik, after taking over TCC Wireless, and later Holdco, knew that Rosa had repeatedly asked for additional payments owed under both the Partnership Agreement and Subscription Agreement. (TAC ¶¶ 56, 73–74, 80, 83, 85, 87.) According to the Third Amended Complaint, Ismail "repeatedly told plaintiff that he would be paid once the retail stores were sold" (TAC ¶ 56) all the while transferring away assets that were originally designated as the source of payment. In reality, Rosa never "receive[d] the benefit of the promises made to him." (TAC ¶ 60.)

Third, the transferors retained control after each conveyance. Ismail and Malik remained the individual corporate officers who controlled TCC Wireless and Holdco at the front-end and back-end of each transfer. Fourth, the transferred property was the only asset to pay Rosa's claim at the time he sought payment. That is, the primary assets—the T-Mobile retail stores—were the source of funds from which Rosa could determine how much he was entitled to be paid, and represented the "value out of which [Rosa] could have realized a portion of his claims under the relevant agreement." (TAC ¶¶ 53, 54.) These assets were transferred away from the primary counterparty with whom Rosa had contracted his partnership interest—TCCC—thereby "circumvent[ing] defendants' financial obligations" to Rosa. (TAC ¶¶ 53, 54.)

Fifth, Rosa sufficiently alleges a pattern or course of conduct by the transferor after payment for services rendered in connection with the Partnership Agreement and the Subscription Agreement came due. The Third Amended Complaint alleges several times that

10

Rosa asked for, and was denied, full payment in accordance with the terms of the Partnership Agreement and Subscription Agreement. And each time Rosa inquired, Defendants evaded his questions and requests regarding payment, continuing instead to represent that he would receive his payments once the retail store business was sold to a third party. (TAC ¶¶ 56, 59, 72–73, 76, 83, 85–87.)

Defendants maintain that the absence of one of the badges of fraud—inadequate consideration—somehow legitimizes the transfer of assets among TCCC, TCC Wireless, and Holdco because the retail store business was eventually sold in accord with the long-term goal. (Holdco Mot. at 21.) But that argument overlooks the purpose of § 276, which is designed to prevent debtors from hindering, delaying, or defrauding their creditors. Grumman Aerospace Corp. v. Rice, 199 A.D. 2d 365, 366 (App. Div. 2d Dep't 1993) ("It is the intent to 'hinder, delay or defraud' with which Debtor and Credit Law § 276 is concerned."). "[I]t is well accepted that intent to hinder or delay creditors is sufficient, and intent to defraud need not be proven." In re MarketXT Holdings Corp., 376 B.R. 390, 403 (Bankr. S.D.N.Y. 2007). Indeed, a "deliberate attempt to stave off creditors by putting property in such a form and place that creditors cannot reach it, even when the purpose of that action is not to defraud them of ultimate payment but only to obtain enough time to restore the debtor's affairs," or for some other purpose, "comes within the meaning of 'hinder' and 'delay' as set forth in section 276." Flushing Sav. Bank v. Parr, 81 A.D.2d 655, 656 (2d Dep't 1981). Therefore, a § 276 claim may prevail "even where fair consideration was paid and where the debtor remains solvent." Grumman, 199 A.D. 2d at 366.

In any event, Rosa was not fully paid pursuant to the terms of the relevant contracts, and the transfer of the primary assets, with badges of fraud, raise the inference that

Defendants actually intended to hinder or delay payment, if not defraud. See Care Envtl. Corp. v. M2 Techs., Inc., 2006 WL 148913, at *10 (E.D.N.Y. Jan. 18, 2006) ("In the present case the plaintiff does not have knowledge of the details of the transfer, such as what consideration was paid. However, the amended complaint alleges that there was a close relationship between the parties since M2 and CMB had identical management, facilities and ownership. The amended complaint also alleges that M2 transferred all or substantially all of its assets . . . alleges that the timing of the transfer was suspicious in that it occurred during the pendency of the current action.").

The other critical issue regarding fraudulent conveyance is damages. That is, whether Rosa has sufficiently established "some injury flowing from the wrongful conduct." Lippe, 249 F. Supp. 2d at 375. "Unless the conveyance diminishes the value [of] the debtor's estate, the claimant has 'no pecuniary harm . . . or right of objection . . . since the assets of the transferor are no less after the questioned transfer was made than before." Lippe, 249 F. Supp. 2d at 375. Defendants claim this component of Rosa's claim is unsatisfied.

But because DCL § 276 requires that Defendants hindered, delayed, or defrauded their creditor, an injury may be "caused by the conveyance because assets were placed beyond the reach of creditors." Lippe, 249 F. Supp. 2d at 375. Rosa's situation is unique because TCCC's obligation to pay him under the Partnership Agreement was tied specifically to the net profits generated by the T-Mobile retail stores. (TAC, Ex. 1.) Depending on the monthly performance of each store, the Partnership Agreement provides a specific method to calculate how much money is owed to Rosa. (TAC, Ex. 1.) Placing these assets out of Rosa's reach—first to TCC Wireless, then to Holdco, and then finally to an unrelated third party—hindered and delayed Rosa's ability to get paid because they were no longer in the possession of the party with

whom he had originally contracted. And each subsequent transfer, without Rosa's consent or knowledge, placed the assets further out of reach from Rosa and eventually into the hands of a party from which he could not seek recourse.

Further, the assets themselves—i.e., the income derived from their monthly performance—were diminished. Any income derived from such assets, as part of the alleged fraudulent conveyance scheme, were either commingled into the bank accounts of entities that were not counterparties to the Partnership Agreement or diverted to separate accounts that Rosa could not access. Thus, even if the assets remained in TCCC's control, Rosa would not have been able to calculate what he was owed on a monthly basis.

Accordingly, TCC Wireless and Holdco's motion to dismiss DCL § 276 claim is denied.

### C. DCL § 276–a

Defendants claim that Rosa is not entitled to attorneys' fees pursuant to DCL § 276–a on the basis that he did not specifically reference the statute in the Third Amended Complaint, and because he has not established that Defendants acted with actual intent to defraud. Although Rosa did not explicitly reference the statute in the Third Amended Complaint, he included a claim for attorneys' fees in the Fourth Cause of Action. (TAC, at 16.) But more importantly, because DCL § 276–a is "derivative of an actual fraudulent transfer claim under DCL § 276," it will "stand[] or fall[]" with the disposition of that claim. In re Dreier LLP, 462 B.R. 474, 494 (Bankr. S.D.N.Y. 2011); see also Starmark, Inc. v. Zaccaria, 818 F.2d 240, 245 n.1 (2d Cir. 1987). "While [Rosa] must prove [Defendants'] fraudulent intent at trial to recover attorneys' fees under DCL § 276–a, it is premature to dismiss a claim for attorney fees at

the pleading stage." <u>Dreier</u>, 462 B.R. at 494.  Accordingly, Rosa may seek attorneys' fees if his § 276 succeeds.

III.   <u>Personal Jurisdiction Over Holdco</u>

    A.  <u>General Jurisdiction</u>

"In diversity cases such as this, a district court looks to the law of the state in which it sits to determine whether it has personal jurisdiction over foreign defendants." <u>First Horizon Bank v. Moriarty-Gentile</u>, 2016 WL 6581199, at *2 (E.D.N.Y. Nov. 3, 2016) (citations omitted).  A court may exercise general jurisdiction under CPLR § 301 if a foreign corporation "has engaged in such a continuous and systematic course of doing business here that a finding of its presence in this jurisdiction is warranted." <u>Fernandez v. DaimlerChrysler, A.G.</u>, 143 A.D. 3d 765, 766 (App. Div. 2d Dep't 2016).  Holdco's "affiliations" with New York must be "so constant and pervasive as to render it essentially at home in" in New York.  <u>Fernandez</u>, 143 A.D. 3d at 766 (citing <u>Daimler AG v. Bauman</u>, 134 S. Ct. 746, 751 (2014)).

Here, the jurisdictional allegations of the Third Amended Complaint fall short of the standard set by the Supreme Court in <u>Daimler</u>.  There are no allegations that would render Holdco "essentially at home" in New York.  Holdco is incorporated in Delaware and has its principal place of business in Illinois.  (TAC ¶ 4.)  And although it is alleged to have operated T-Mobile retail stores located in New York, that allegation alone is insufficient to establish a "substantial, continuous and systematic course of business" that would qualify New York as the "truly 'exceptional' case" outside of the traditional place of incorporation or principal place of business.  <u>Brown v. Lockheed Martin Corp.</u>, 814 F.3d 619, 627 (2d Cir. 2016).

B. <u>Specific Jurisdiction</u>

New York's long-arm jurisdiction statute provides a number of ways in which specific jurisdiction may be obtained. Under CPLR § 302(a)(3), "a non-domiciliary defendant is subject to specific jurisdiction within New York if it committed a tortious act outside of New York and that act caused injury to a person or property in New York, if one of the following two criteria is also met: (i) the defendant regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in New York; or (ii) the defendant expected or reasonably should have expected that his or her action[s] would have consequences in New York, and the defendant derives substantial revenue from interstate or international commerce." <u>Joint Stock Co. Channel One Russia Worldwide v. Informir LLC</u>, 2017 WL 825482, at *7 (S.D.N.Y. Mar. 2, 2017).

Under New York law, "a fraudulent conveyance is a species of tort." <u>Moriarty-Gentile</u>, 2016 WL 6581199, at *2. Here, Holdco was the transferee of a fraudulent conveyance in December 2014, which occurred outside of New York at the direction of Ismail and/or Malik in their capacities as officers of both TCC Wireless (transferor) and Holdco (transferee).

To determine the situs of a nonphysical, commercial injury arising from a fraudulent conveyance, the "critical question is [] where the first effect of the tort was located that ultimately produced the final economic injury." <u>Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez</u>, 171 F.3d 779, 792 (2d Cir. 1999). Put another way, the situs-of-injury test seeks to ascertain the "original event which caused the injury," which is "generally distinguished not only from the initial tort but from the final economic injury and the felt consequences of the tort." <u>Bank Brussels</u>, 171 F.3d 779, 791 (2d Cir. 1999) (citations omitted).

TCC Wireless's "primary assets," including T-Mobile retail stores in New York, were transferred to Holdco as part of the allegedly fraudulent transaction. The original tort—fraudulent conveyance—occurred outside of New York, but the "original event that caused the injury" was the change of ownership over the retail stores, including those in New York. That change of ownership resulted in the removal of assets to hinder, delay, or defraud Rosa, a New York resident, from payment. See Bank Brussels, 171 F. 3d at 792; Hargrave v. Oki Nursery, Inc., 636 F.2d 897, 900 (2d Cir. 1980) ("One immediate and direct 'injury' [defendant's] alleged tortious misrepresentations caused to plaintiffs was the loss of the money paid by them for the diseased vines. That injury was immediately felt in New York where plaintiffs were domiciled and doing business, where they were located when they received the misrepresentations, and where the vines were to be shipped."). Additionally, the alleged fraudulent transfer of New York retail stores impaired Rosa's monetary interest in the stores because that interest was tied to an entity—TCCC—which no longer counted the stores as its primary assets. See Universitas Educ., LLC v. Nova Grp., Inc., 2014 WL 3883371, at *6 (S.D.N.Y. Aug. 7, 2014).

Rosa also is required to demonstrate one of two things: (1) that Holdco regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state; or (2) Holdco expected or reasonably should have expected its actions would have consequences in New York, and the defendant derives substantial revenue from interstate or international commerce. Here, Rosa alleges that Holdco "took over the ownership, control, and operations of the T-Mobile retail stores from defendant TCC Wireless," (TAC ¶ 9) which were previously "owned, controlled, and operated on a daily basis by defendant TCC Wireless," (TAC ¶ 8) including, "but not limited to, New York State." (TAC ¶ 7.) The Third Amended Complaint

16

further asserts that Rosa focused his energies on "scouting locations for new retail business stores in the Northeast," (TAC ¶ 41) and that Malik "often traveled to the retail stores in New York to oversee management of each store." (TAC ¶ 44.) Revenue derived from the bloc of stores in the Northeast region was significant—approximately $700,000–$800,000 per month. (TAC ¶ 79.) Under either scenario, Holdco reasonably expected that its actions would have consequences in New York.

Having concluded that specific jurisdiction over Holdco exists, this Court must determine whether the exercise of jurisdiction comports with the Due Process Clause of the Fourteenth Amendment, which requires "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985). The due process analysis entails two components: (1) the minimum contacts inquiry and (2) the reasonableness inquiry. Chloe v. Queen Bee of Berverly Hills, LLC, 616 F. 3d 158, 171 (2d Cir. 2010). "Ordinarily . . . if jurisdiction is proper under the CPLR, due process will be satisfied because CPLR § 302 does not reach as far as the constitution permits." Topps Co., Inc. v. Gerrit J. Verburg Co., 961 F. Supp. 88, 90 (S.D.N.Y. 1997).

Holdco purposefully availed itself of doing business by operating T-Mobile retail stores located in New York. At the time of the alleged fraudulent transfer, Holdco and the other defendants knew that Rosa had not been fully paid pursuant to terms of the Partnership Agreement, which entitled him to a 25% interest in any new Northeastern retail stores he was responsible for opening. A portion of those stores were located in New York, and therefore, the alleged fraudulent conveyance from TCCC to TCC Wireless to Holdco had the effect of hindering, delaying, or defrauding Rosa of full payment.

Under the reasonableness inquiry, a plaintiff must establish that an exercise of jurisdiction does not "offend traditional notions of fair play and substantial justice." Asahi Metal Indus. Co. v. Superior Court of Cal., Solano Cnty., 480 U.S. 102, 113 (1987). The Supreme Court in Asahi prescribed factors to guide this analysis: (1) the burden on the defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. Asahi, 480 U.S. at 113. "Where other elements for jurisdiction have been met, dismissals on reasonableness grounds should be few and far between." Gucci Am., Inc. v. Frontline Processing Corp., 721 F. Supp. 2d 228, 246 (S.D.N.Y. 2010) (citations omitted).

Exercising jurisdiction over Holdco in this action is reasonable. The burden on Holdco is minimal in view of the fact that it has been litigating this action in this Court for more than two years alongside its co-defendants. Both the forum state here—New York—and its resident, Rosa, share an interest in resolving the issues in this case, namely the alleged fraudulent conveyances of assets located, and operating, in the state. That interest coincides with the interest of neighboring states in which jurisdiction could be proper—this case largely centers on Rosa's partnership interest in assets that are specifically tied to the Northeast region, including New York. Collective resolution of the claims asserted against all parties furthers the interstate judicial system's interest in reaching the most efficient result. Accordingly, this Court finds that jurisdiction over Holdco is proper.

IV. Successor Liability

Defendants TCC Wireless and Holdco claim that they are not subject to liability under the Partnership Agreement as successors to TCCC. Generally, an entity that acquires

18

assets from another is not responsible for its predecessor's liabilities absent one of four exceptions: "(1) the successor corporation expressly or impliedly assumed the liabilities of its predecessor; (2) there was a consolidation or de facto merger of the two business entities; (3) the successor is a 'mere continuation' of the predecessor; or (4) the transaction is entered into fraudulently to escape such obligations." Societe Anonyme Dauphitex v. Schoenfelder Corp., 2007 WL 3253592, at *2 (S.D.N.Y. Nov. 2, 2007).

Here, having established that Rosa's fraudulent conveyance claim may proceed, the fourth exception of the successor liability test applies. The Third Amended Complaint alleges that Rosa entered into a Partnership Agreement with TCCC and Ismail. (TAC ¶ 37, Ex. 1.) The Third Amended Complaint also asserts that Rosa performed his obligations under the contract—beginning in 2011, he began scouting locations and negotiated terms to open new retail business stores in the Northeast. (TAC ¶¶ 41, 43.) Defendants—including successors-in-interest TCC Wireless and Holdco—failed to pay the full amounts owed to Rosa and therefore breached the Partnership Agreement. (TAC ¶¶ 56, 54, 87.) And finally, Rosa alleged that he was not paid his entire share of monthly profits, approximating $700,000-800,000, and that he believes he was damaged in an amount exceeding $9 million. (TAC ¶¶ 79, 98.) Accordingly, in view of this Court's finding that TCC Wireless and Holdco are successors, their motion to dismiss Count One is denied.

V.  New York Labor Law

This case rises and falls on Rosa's claim that TCCC's assets were fraudulently conveyed to TCC Wireless and Holdco because that finding also subjects TCC Wireless and Holdco to successor liability. Therefore, TCC Wireless and Holdco as successors must assume TCCC's liabilities under the Partnership Agreement and potentially as employers under New

19

York Labor Law. But finding successor liability does not obviate Rosa's independent obligation to sufficiently plead the necessary elements to any claim he seeks to assert against Defendants.

Here, although successor liability may attach under the New York Labor Law "just as it does for contract and tort obligations," (Rosa Mot. at 21) Rosa's allegations are insufficient to establish the critical elements of the cause of action. Indeed, as TCC Wireless notes, "[e]ven assuming that [TCC] Wireless can be shown to be liable under the Partnership Agreement, [Rosa] has not alleged the existence of an employer-employee relationship . . ." nor has he alleged that "he was an 'employee' of Wireless." (TCC Wireless Mot. at 17.) Rosa recites the claim's elements in conclusory fashion, and the Third Amended Complaint is bereft of any facts that illuminate his employee-employer relationship with Holdco and TCC Wireless's predecessor, TCCC, under which successor liability could conceivably attach. Accordingly, the New York Labor Law claim against TCC Wireless and Holdco is dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, TCC Wireless and Holdco's motions to dismiss Counts One and Four are denied. Malik's motion to dismiss Count Four, and TCC Wireless and Holdco's motions to dismiss Count Six are granted. Malik's motion to dismiss Count Six is dismissed as moot in view of Rosa's voluntary withdrawal of the claim. (Plaintiff's Memo. of Law in Opposition to Defendants' Motions to Dismiss at 21 (ECF No. 82).) The Clerk of Court is directed to terminate motions pending at ECF Nos. 76 and 78.

Dated: March 13, 2017
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.